USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11-15-17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FERNANDO MADERA,             :

                 **Petitioner,**     :

          - against -        :

SUPERINTENDENT,           :
**Livingston Correctional Facility,**

                 **Respondent.**    :

**REPORT AND**
**RECOMMENDATION**

**13-CV-8058 (AT)(RLE)**

**To the HONORABLE ANALISA TORRES, U.S.D.J.:**

## I. INTRODUCTION

*Pro se* Petitioner Fernando Madera ("Madera"), a New York state prisoner currently incarcerated at Livingston Correctional Facility, seeks a writ of habeas corpus pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. Madera was convicted of three counts of robbery in the first degree (New York Penal Law ("NYPL") § 160.15(4)) and three counts of robbery in the second degree (NYPL § 160.10(1)) following a jury trial. As a second violent felony offender, he was sentenced to ten years' imprisonment on each count, to run concurrently, followed by five years of post-release supervision. In his Petition, Madera challenges his conviction and alleges violations of his Due Process rights on two grounds: 1) police officers arrested him despite an inconsistent eyewitness description and following an "unduly suggestive police lineup"; and 2) the trial court abused its discretion during the *Sandoval* hearing ruling by failing to engage in a balancing of interests before ruling in favor of the prosecution. (Pet. for Writ of Habeas Corpus ("Pet.") at 5.) For the reasons set forth below, I recommend that the Petition be **GRANTED**.

## II. BACKGROUND

### A.    Factual Background

#### 1.    The Victims and the Crime Scene

On January 21, 2010, Angela Krevey, James Chmiel, and Thomas Mahoney met in the office of Pier i Café, an outdoor restaurant located at 500 West 70th Street in Riverside Park in Manhattan. (Doc. No. 14, Trial Transcript ("Tr.") at 159-61, 175, 267-69, 305-06, 309-11, 326-27.) Krevey is the co-owner and manager of the café, Chmiel is Krevey's bookkeeper and manager, and Mahoney is Krevey's accountant. (*Id.* at 159-60, 267-68, 305.) The restaurant itself was closed for the season, but the office (located in a trailer across a bicycle path from the restaurant) was open. (*Id.* at 160, 268, 309.) Krevey, Chmiel, and Mahoney worked out of this trailer office. *Id.* at 160. The inside of the trailer is in a "railroad" style and has two sections. (*Id.* at 160.) The first section has two desks, a copy machine, and a couple of file cabinets. (*Id.*) The second section has two-and-a-half desks, file cabinets, two safes, and a closet. (*Id.*) The trailer has three windows. (*Id.*)

#### 2.    The Robbery

James Chmiel was the first to arrive at the trailer on January 21, 2010, at approximately 11:00 a.m. (*Id.* at 309.) Just before 12:30 p.m., Mahoney arrived, and Krevey arrived shortly thereafter. (*Id.*) After "five to ten minutes" the "door flew open[], [and] two men came in [to the trailer], one holding a gun." (*Id.* at 179-80.) The gunman had a bandanna over his face, so that only his  Although he wore a bandanna, it did not entirely cover his face.

The gunman and the lookout walked into the first section of the office trailer. (*Id.* at 181.) The gunman then walked into the second half of the office trailer where Krevey's office was, while the lookout remained in the front half. (*Id.*) He pointed his gun "directly" at

2

Mahoney and Chmiel and told them to "get down on the floor and to put their heads down." (*Id.* at 183-84, 232, 269, 313.) They complied. (*Id.* at 184.) The gunman then approached Krevey, put the gun to her head and demanded that she open the safe. (*Id.* at 183.) When she did not act quickly enough, he told her he was "going to count to three." (*Id.*) Krevey did not know the safe's combination, but got down on her knees and tried to think of a possible combination that her husband would have chosen for the safe. (*Id.*) For "a couple of minutes," the gunman continued to demand that Krevey open the safe. (*Id.*)

When Krevey was unable to open the safe, she told the gunman that she "could call someone and get the number." (*Id.* at 184.) He told her she "couldn't do that" and, after holding the gun to Krevey's head for a "long time," he told the three victims "to empty [their] bags and pockets and to hand over cash and cellphones." (*Id.*) Krevey gave approximately $970 from her wallet, but could not find her cell phone. (*Id.* at 185.) The gunman took $200 from Chmiel's wallet. (*Id.* at 314-15.) He then put the gun to Mahoney's head and Mahoney handed over ten $100 bills. (*Id.* at 274-75.) After the gunman took the money, Mahoney told him and the lookout: "Look, you guys got the money, take the money and get out of here." (*Id.*) The lookout then yelled "[L]et's get out of here," and the two men left. (*Id.* at 315.). There is nothing in the record that there was anything distinctive about the lookout's voice when he said this.

### 3. Initial Police Response

As soon as the robbers left, Krevey called 911. (*Id.* at 189-90, 315.) She did not tell the 911 operator that she recognized either robber. Police Officer Farrell Conroy and another officer responded to the 911 call and arrived at the trailer "just after 1:00 p.m." (Tr. at 193, 275, 296-98, 316.) Detective Francis Brennan interviewed Krevey at the precinct two to three hours after the incident. (*Id.* at 209-10, 213.) Krevey described both suspects as light-skinned male blacks. (*Id.*

at 258).

### 4. Detective Galan Takes Over The Investigation

On January 22, 2010, the day after the robbery, the investigation was reassigned from Detective Brennan to Detective Frank Galan. (*Id.* at 213, 349-50.) Galan had seventeen years' experience as an officer, including ten as a detective. He had worked in three different precincts. His duties as a detective included "investigat[ing] crimes," particularly "[f]elonies, major crimes." (*Id.* at 347.) He started where Brennan left off.

> Q. And were you given any of that detective's paperwork?
> A. Yes, I was.

(*Id.* at 350.) He then proceeded to gather firsthand information from the victims:

> Q. And once you were assigned this investigation, what did you do?
> A. I followed up on the case.
> Q. And what does that mean?
> A. I proceeded to reinterview the victims and do whatever else was necessary to follow up on the investigation.
> Q. And with whom did you speak when you say you reinterviewed the victims?
> A. I spoke to the victim Angela Krevey, and I also spoke to the other two victims also.
> Q. Do you remember their names?
> A. Yes, Thomas Mahoney and James Chmiel
> Q. Did you speak with those three people in person or over the phone?
> A. And Krevey was in person and the other two individuals were over the phone.
> Q. Did you speak with them – I'm sorry.
> Did you ever speak with James Chmiel in person?
> A. Yes I did.
> Q. And do you remember the date of that conversation?
> A. That was on the 27.
> Q. Of what month?
> A. January
> Q. 2010?
> A. Yes, ma'am.

(*Id.*) Based on these interviews and the reports he reviewed, Detective Galan determined that he was looking for two light-skinned, male blacks. (*Id.* at 367.) To aid the investigation, Detective Galan re-interviewed Krevey on January 23 because he felt that her description of the lookout

was "vague." (*Id.* at 365-66.) According to Galan, Krevey stated that the lookout was a dark-skinned, black male who was approximately six feet tall and 170-175 pounds with no "unusual characteristics" like tattoos. (*Id.* at 367-69, 373-74) Galan recalled Krevey telling him that the lookout did not have facial hair, (*Id.* at 374). Galan testified that when he asked Krevey if she could tell him the hairstyle or hair length of the lookout, she was not able to. (*Id.* at 376.). Based on his interview with Krevey, Galan prepared a description sheet of the lookout. He testified that he usually leaves description sheets blank when a witness "either doesn't know the answer or can't remember." (*Id.* at 380.) He left blank the spaces for hair length; color and style; as well as the spaces for mustache; goatee; beard; and "tattoos and/or scars." (*Id.* at 377-78, 380-81.) Galan testified that he did not ask Krevey separate questions about each of those characteristics, but filled out the form "based on what she told [him]." (*Id.* at 401.)

### 5.    Madera's Appearance at the Time of His Arrest

At the time of his arrest, Madera was 6'3" tall and weighed 170 pounds. (*Id.* at 387, 389.) Detective Galan noted that Madera "was wearing very baggy jeans, work boots, and had numerous tops, I specifically remember a yellow top." (Tr. 349.)[1] Chmiel testified to seeing Madera just before the robbery and that Madera was wearing decrepit clothes. Madera had a light beard and a mustache, a small teardrop tattoo on his face, and his hair was in long braids. (*Id.* at 397-98.) According to Madera's Appellate Division brief, he also had "a large neck tattoo."[2] (Doc. No. 13-2 at SR9, SR15.) Chmiel testified that Madera spoke with a Hispanic accent. No cell phones, money, or other items from the robbery were recovered from Madera at the time of his arrest. (Tr. at 394, 397.) The gunman in the robbery was never apprehended or identified.

---

[1] Madera was dressed like a stereotypical homeless street person in mid-winter garb, complete with multiple layers of clothing.

[2] Madera's tattoos are visible in the photo array entered into evidence for the trial court as People's Exhibit 4.

(Doc. No. 13-1 at 12.)

### 6. Madera Becomes a Suspect

Madera does not enter the picture because the police picked him up from the information provided by the victims. Rather, he is picked up for having an open container of alcohol. The police did not call the victims to identify a suspect in the robbery. Instead, Krevey learned that a homeless man had been arrested at the trailer. Tr. 234-35. She called Galan on January 27. Tr. 235-36.

That same day, Detective Galan showed Chmiel an array of six photos at the stationhouse. (*Id.* at 351-52, 390.) The bottom right photograph was a photograph of Madera. (*Id.* at 352.) Chmiel recognized Madera, but could not remember if he said he frequently saw him in the area near the trailer. (*Id.* at 335-36.) Detective Galan recalled Chmiel saying he was familiar with Madera from the area. (*Id.* at 390.) Chmiel, however, did not identify Madera as one of the robbers. (*Id.* at 335-36, 390-91.)

The next day, January 28, Detective Galan presented a lineup of five people, including Madera, to Krevey. (*Id.* at 195, 238-39, 354-56, 360, 385.) To address the fact that Madera was over six feet tall and some of the lineup's fillers were noticeably shorter than Madera, Detective Galan made everyone sit. [3] (*Id.* at 357, 385-86.) He also made each of the fillers and Madera wear a hat because Madera "had braids and some of the fillers had shorter hair." (*Id.* at 357.) Krevey had never participated in a lineup identification before and she was told how the process would work:

> Q. And can you describe for the jury the process that you remember going through to view the lineup?

---

[3] The fillers' respective heights were (1) 6'2'', (2) 5'10'', (3) 5'11'', and (5) 5'8''. (*Id.* at 388.) Filler number one's weight was 210 pounds. (*Id.*) Thus, three of the fillers were substantially shorter than Madera, and the other was 30-40 pounds heavier.

A. I was briefed on what a lineup -- what it would be like, because I never ever had done that before.
    And they told me to take my time and -- as long as I wanted to -- and not to be nervous, and they gave me a rundown of how it was going to go.
Q. And what do you mean by rundown?
A. If you see -- <u>if you can identify someone I was supposed to tell them.</u>

(*Id.* at 195-96.) (emphasis added) Krevey initially viewed the subjects from about ten to twelve feet away, but asked Detective Galan to bring them closer so she could "be very sure" that she "was correct." (*Id.* at 239-41, 244, 257.) Viewing the lineup subjects more closely, Krevey picked Madera as the lookout during the robbery:

Q. And what number -- Who did you recognize?
A. I recognized the person who I <u>concluded</u> came into the office trailer.

*Id.* (emphasis added)

Krevey did not indicate to Detective Galan that she had had multiple contacts with Madera at the restaurant. For example, there is no record that either Chmiel or Mahoney were ever asked a question such as, "Ms. Krevey thinks the lookout may have been a homeless man who frequents the area. Can you provide any information about this individual?" At this point in the investigation, the police were *not* looking for (1) a Hispanic male; or (2) a man with an accent; or (3) a man with long braids; or (4) a man with a beard; or (5) a man with a facial tattoo. In sum, they were not looking for anyone who fit Madera's description.

7.      **Trial Testimony**

        a. *Krevey*

Unlike her responses to Detective Galan, Krevey's recollections of Madera were not vague at the trial. She was "certain" that Madera was one of the two people that came into the office trailer the day of the holdup. (Tr. at 197) Krevey also indicated that Madera was "the person that came into the trailer maybe a month or two prior [to the robbery] demanding to use

the bathroom" and that he was "the person who [Krevey] had seen on a regular basis . . . who would pass the entrance in front of [the] office trailer." (*Id.* at 196-97, 246.)

Krevey testified that, on the day of the robbery, as she backed her car into a parking space, she noticed Madera standing behind her car and "made a motion to him a couple of times to move out of the way" because she did not want to hit him. (*Id.* at 177.) After getting out of her car, she noticed that Madera was standing in front of the garbage bins. (*Id.* at 178.) She walked past Madera, making eye contact but not speaking, and entered the trailer. (*Id.* at 178-79.)

> A. . . . . . .
> While I was parking my car, there was someone behind me who was just standing at -- sort of behind the gate. And I was backing my car up and I made a motion to him a couple of times to move out of the way because I didn't want to hit this individual.
> Q. Did you recognize that individual while you were in the car?
> A. Yes.
> Q. Okay. And who did you recognize that individual to be?
> A. One of the homeless men. The one that I saw most often.
> Q. Is it the same homeless man you had the argument with in the trailer?
> A. Yes.

(*Id.* at 176.) Finally, Krevey testified in detail about the lookout's appearance and physical characteristics:

> Q. And that's the man with the gun. What did the other man look like?
> A. Very tall and very, very thin.
> Q. Did you -- what was that man wearing?
> A. He was wearing jeans, blue jeans, a gray T-shirt, a hooded gray T-shirt, and he had -- from what I remember it was probably a bandanna but maybe not -- it was -- he had something around his neck.
> Q. Did -- were you able to see his face?
> A. Yes.
> Q. And did you recognize that man?
> A. Yes.
> Q. And who did you recognize him to be?
> A. The person who was standing in front of the garbage bin and the person that was -- who was the same person who was, you know, standing behind the gate who I recognized to be as the homeless person I saw in the vicinity quite often.

(*Id.* 182.)

Krevey testified that Madera was a "homeless person" she had seen outside of the restaurant "quite frequently," "at least once [or] twice a week."[4]   (*Id.* at 162, 201.)  She described Madera as a "tall" and "very slender" man with "sort of long hair." (*Id.* at 162, 208.) He was "unshaven" at times and tended to wear "[s]habby, unwashed" clothing. (*Id.* at 201, 205-08.)  Krevey remembered that Madera had his hair in a style that was "sometimes like a ponytail or like braids . . . or braids that were then put in a ponytail." (*Id.* at 208.)

About two months earlier, in November 2009, Krevey testified that she and Madera had had a confrontation and argument about his desire to use the restaurant's bathroom:

> Q. Did you ever have an opportunity to speak with that homeless man?
> A. Yes.
> Q. And approximately how many times do you remember speaking with him?
> A. Once.
> Q. And can you describe for the jury what that conversation was?
> A. He came into our office, trailer office and he demanded to use our bathroom, which at the time was locked because our café was closed for the season.  I told him we couldn't give out the key, and he asked me who I was and what authority I had to tell him that.  And he would never take no for an answer so we went back and forth where I can't give you the key and he kept insisting.  He kept asking me who I was, who I am, what do I do here.
>          . . . . .
> Q. In the trailer when you had this argument what were the lighting conditions like?
> A. Fine.  We had the lights on.  It was during the day.  We had our lights on bright.
> Q. Were you able to clearly see the face of the man you were arguing with?
> A. Yes."

(*Id.* at 163-4.)

---

[4] In the transcript, Krevey states that from January 2009 to January 2010, she noticed other homeless individuals in the vicinity.  However, Madera was the homeless man that Krevey saw most often ("a couple of times a week on bicycle or by foot."). (*Id.* at 162, 163, 176.) No other victim mentioned a bicycle in connection with Madera or any other homeless person..

During her direct testimony, however, Krevey was uncertain about her description of

Madera:

> Q. Okay, now, I'm only interested at this point in your description given to
> Detective Brennan as to the lookout, the person you describe as a lookout.
> A. A-hum.
> Q. Do you remember describing him as a light-skinned male black?
> A. From what I remember I might have said a dark-skinned Hispanic.
> Q. Well, do you remember how you described his race to Detective Brennan?
> A. I remember.
> . . . .
> Q. And did you, in fact, say to Detective Brennan later that afternoon that you
> observed two light-skinned male blacks wearing gray hooded sweatshirts enter the
> trailer; do you remember saying that?
> A. Yes.

(*Id.* at 210.) Krevey doesn't deny the description she gave to Brennan. She maintains, however,

that the description she gave is consistent with her memory at trial:

> Q. Please, did you say that to him? If you don't remember that's fine.
> A. I don't remember exactly what I said. I don't remember exactly what I said. I
> remember what I remember, but I don't remember exactly what I said.

*Id.* at 211. Krevey admits, however, that she gave Brennan the description shortly after

the robbery:

> Q. And did you, in fact, tell Detective Brennan later that afternoon it was two
> light-skinned male blacks?
> A. Yes.
> . . . .
> Q. And Ms. Krevey, the conversation you had with Detective Brennan, is it fair to
> say it was two hours or so, maybe three hours after the incident?
> A. Yes.
> Q. Approximately?
> A. Yes

Despite the "vague" description provided by Krevey, Detective Galan tried

unsuccessfully to arrange with Krevey to canvass the neighborhood for suspects.[5]

---

[5] This apparent lack of urgency in canvassing the neighborhood is inconsistent with the police having been told that one of the robbers was a frequent visitor to the restaurant. Detective Galan testified that he had completed his official form "based on what [Krevey] told him" (Tr. at 401.), but there was no mention of braids.

Q. Why didn't you actually go on a canvass or survey the area with Angela Krevey?
A. The attempt was made to do it, but her schedule was conflicting with -- she had a very tight schedule and also I had a trial, ongoing trial also. . ..

(*Id.* at 402.)

Krevey admitted that she believed Galan asked her about "the color" of the lookout, and she said the person was black because "the person was darker." (*Id.* at 216) On cross examination, Krevey remembered describing the lookout as a "dark-skinned Hispanic," but conceded that she told Detective Brennan that she "observed two light-skinned male blacks." (*Id.* at 210-12.) Krevey maintained was indicated that there was no difference between her prior description of the lookout and her trial testimony that the lookout was Hispanic, asserting "dark-skinned Hispanic, light-skinned black, I don't...I don't know if that's the same thing..." (*Id.* at 213.) In addition, although Galan's notes did not reflect that the lookout had distinctive hair, Krevey maintained at trial that she told him that the lookout "had long braided hair." (*Id.* at 221.) [6]

Krevey testified that a few days after the incident, on or about January 27, 2010, one of her workers informed her that a homeless person had been arrested for the incident at the trailer. (*Id.* at 234-35.) The homeless man gave some property to the worker, who in turn gave the property to Krevey's husband. (*Id.* at 235.) Krevey's husband later gave it to the police. (*Id.* at 235.) The property included "two cell phones," neither of which belonged to any of the victims of this case, and "no money." (*Id.* at 394, 397.) Krevey then called Galan to tell him that the person had been arrested. [7] (*Id.* at 235-36, 384.)

---

[6] None of the other victims remembered this rather distinctive feature of the lookout's hair.

[7] The prosecution acknowledged "the defendant's arrest was predicated upon Ms. Krevey's call to Detective Galan that she believed that the suspect in the robbery was already in police custody." (*Id.* at 140.) However, the jury was not informed that Madera was the arrested homeless man, or that the arrest was for having an open container of alcohol. (Tr. at 139-41.)

On direct examination, Krevey was asked if she would recognize the homeless individual that she argued with in November 2009. (*Id.* at 164.) Krevey answered that she did not know. (*Id.*) She explained that she was "very nervous" and "did not get a clear view of everyone sitting [in the courtroom]." (*Id.* at 254-55.) She also explained that based on where she was sitting in the courtroom, her "view" was "blocked."[8] (*Id.* at 254-56.) The prosecution rested without the dramatic eyewitness testimony in open court in front of the jury. The court recessed for the day after the cross-examination of Krevey. When Krevey returned the next day for re-direct, she identified Madera, she identified Madera. (*Id.* at 252.)

### b. *Mahoney*

Aside from testifying that a robbery took place, Mahoney provided no information to support a conviction. Indeed his testimony underminds portions of Krevey's testimony. For example, Mahoney indicated that he saw a tall, thin man in decrepit clothing rummaging through the garbage:

> Q. Did you see anyone along your walk to the trailer?
> A. Yes. There was only one person that I saw and it was a man who was rummaging through some garbage pails.
> Q. What was that man's physical description?
> A. He was tall and thin with, you know, like decrepit kind of clothing.

Tr. 269. Except that this person is "tall and thin," there is nothing to suggest that he could be Madera. And there is nothing to indicate that he was one of the robbers. As discussed below, Mahoney's description of the man's clothing is incoconsistent with the clothing worn by the robbers.

In addition, while the robbery took place in the second entry room, Mahoney placed the

---

[8] The record does not reflect where the defendant Madera could have been in the courtroom such that a witness's view would be blocked. There is no indication that Madera changed locations during the trial. Detective Galan was able to identify him without difficulty.

lookout in the first room, behind a door. (*Tr.* 271.) ("He had just entered the door behind the other guy. He was more like behind the door.") Mahoney also testified that at the time the gunman came into the second room, Krevey was not looking in that direction but was looking for some papers:

> Q. Please just answer the question. Just answer the
> question.
> A. She was not on the computer, no.
> Q. Do you know which direction she was facing
> A. -- She may
> Q. -- at the time the two men came in?
> A. She was looking for papers. I was requesting
> information from the clients.

(*Tr.* 279.) The gunman went to Krevey and put a gun to her head (*Tr.* 272) (" Yeah, the man with the gun came in and put it to Angela's head.") Krevey was visibly shaken:

> Q. And then what happened?
> A. He told her to open the safe
> Q. Did he say anything else that you remember?
> A. Well, she was nervous and stumbled at first and she
> responded she couldn 't remember or didn 't know the combination or
> something to that effect.

(*Tr.* 272.)

Mahoney didn't get to see the robbers because his main focus was the barrel of the gun Tr. 281. He did, however, hear a  conversation between the robbers and heard the lookout say they had to get out:

> Q. Did the men leave?
> A. There was a brief conversation. The second man said we
> better get out of here. And then the guy with the gun said, okay, let's go.
> the lookout state that the robbers had to get out of the office. .

(*Tr.* 275.)   By hearing the conversation between the robbers, Mahoney was able to discern that the second robber was male:

> Q. Did you notice his face at all? Just the bottom of his physique . You knew he

13

was a man?
A. Yes, yes . By the voice, by the voice, by the
conversation that happened later on.

(*Tr.* 281-82.) He was therefore able to confirm that the lookout was male. There was no

testimony offered or elicited about any accent the lookout might have had.

### c. *Chmiel*

Chmiel testified that he was familiar with Madera. He described him as a tall, thin male

that he assumed was Hispanic because of his "Hispanic" accent:

Q. And could you describe what that homeless individual
looked like?
A. tall, thin, assuming Hispanic male.
Q. And what do you mean by assuming Hispanic?
A. Darker complexion than me, darker hair. Having heard
him speak, you know, slight -- what I consider a Hispanic accent

(*Tr.* 306.) He noted that Madera had a "darker complexion" and "darker hair." *Id.* Chmiel had

spoken to Madera "[m]aybe a half dozen times" from about "five to ten feet [away]." *Tr.* 307 He

had no trouble identifying Madera in the courtroom. *Tr.* 308. He even noticed that Madera's hair

was a little shorter at the time of trial and that he had gained some weight. *Tr.* 308.

When Chmiel got to the trailer around "11, 11:15 in the morning," he noticed Madera

"standing, kind of pacing, walking by [the] garbage dumpsters." *Tr.* 309. After the gunman took

money from the victims, Chmiel was able to hear the lookout's voice as he "yelled" to the

gunman, "[L]et's get out of here to get out. (*Tr.* 315.) Chmiel did not indicate that he recognized

the voice as Madera's or that the lookout spoke with a Hispanic accent. Chmiel picked Madera's

picture out of a photographic array as someone he knew, but did not identify him as one of the

robbers.[9]

---

[9] Defense counsel tried to object to the prosecutor entering the photo array into evidence, apparently concerned that

THE COURT: It seems to me you have [done] everything but introduc[e] the photo array, and that's all that is left to be done. <u>And it still doesn't say he recognized the robber. It just says he recognizes the defendant's face in the array.</u>

(*Tr.* at 338.) (emphasis added)

## B. Procedural Background

On November 8 and 9, 2010, prior to trial, the court held a suppression hearing to determine, among other things, whether Krevey's identification of Madera was unduly suggestive. (*See* Doc 14-1 and 14-2.) That suppression hearing was not at issue on direct appeal and is not at issue in this habeas proceeding. (Doc. No. 13-1 at 5.) The case proceeded to trial before Justice Renee White and a New York County jury on March 31, 2011. (Doc. No. 13-3 at SR119-120; Doc. No. 13-1 at 4.) Before trial, a *Sandoval* hearing was held, in which the court held that the prosecution could inquire about Madera's prior felony and misdemeanor convictions. (Tr. at 11-12.) Madera thereafter decided not to testify at trial. (Doc. No. 13-2 at SR9.)

A New York County grand jury charged Madera with three counts of robbery in the first degree (displaying what appeared to be a pistol), and three counts of robbery in the second degree (aided by another person actually present). (Doc. No. 13-3 at SR108-110.) On April 8, 2011, the jury convicted Madera of all charges. (Doc. No. 13-3 at SR119; Doc. No. 13-1 at 2.) On May 10, 2011, Madera was sentenced as a second violent felony offender to ten years' imprisonment on all three counts of second degree robbery, to run concurrently, followed by five years of post-release supervision. (Doc. No. 13-1 at 1-3.)

Madera filed a brief on direct appeal in the Appellate Division, First Department, asserting the following claims: 1) the prosecution failed to establish beyond a reasonable doubt

---

it would be prejudicial to indicate to the jury that Madera had been picked out of a photo lineup shortly after the robbery. Tr. 338.

that Madera was the perpetrator, and the verdict was against the weight of the evidence; and 2)

the trial court's *Sandoval* ruling violated Madera's due process rights by allowing inquiry into all

of Madera's prior convictions. (Doc. No. 13-2 at SR1-49.) On April 30, 2013, the Appellate

Division, First Department, unanimously affirmed Madera's conviction. *People v. Madera*, 105

A.D.3d 680 (1st Dep't 2013); (Doc. No. 13-3 at SR186-88.) The court found that there was "no

basis for disturbing the jury's determinations concerning identification and credibility, including

its resolution of any discrepancies in the main witness's description of the perpetrator. The court

further found that the reliability of Krevey's identification was enhanced by the fact that she was

familiar with [Madera] from his repeated presence in the area, and from having seen him shortly

before the crime." *Madera*, 105 A.D.3d at 681. The Appellate Division also found that the trial

"court's *Sandoval* ruling balanced the appropriate factors and was a proper exercise of

discretion." *Id.*

On April 30, 2013, Madera applied to the New York Court of Appeals for permission to

appeal. (Doc. No. 13-3 at SR189-96.) The initial letter asked the Court to "consider and review

all issues in the attached briefs, including the State and Federal Constitutional issues contained

therein." (*Id.* at 189.) The follow-up letter asserted solely Madera's claim for sufficiency of the

evidence. (Doc. No. 13-3 at SR190-96.) On July 15, 2013, the Court of Appeals denied leave to

appeal. *People v. Madera*, 21 N.Y.3d 1017 (2013); (Doc. No. 13-3 at SR205.) Madera

commenced this action *pro se* on October 29, 2013. (Doc. No. 2, IFP Application.)

### III. DISCUSSION

**A.     Threshold Issues**

**1.     Timeliness**

A petitioner must file an application for a writ of habeas corpus within one year of his

conviction becoming final. *See* 28 U.S.C. § 2244(d)(1). A conviction becomes final "when [the] time to seek direct review in the United States Supreme Court by writ of certiorari expire[s]," that is, ninety days after the final determination by the state court of appeals. *Williams v. Artuz*, 232 F.3d 147, 150 (2d Cir. 2001) (quoting *Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998)). Here, the New York State Court of Appeals denied Madera leave to appeal his conviction on July 15, 2013. Therefore, Madera's conviction became final for purposes of the AEDPA ninety days later, on October 14, 2013. Madera's *pro se* petition, dated October 29, 2013, is therefore timely.

### 2. Exhaustion

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the Court may not grant a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. 28 U.S.C. § 2254(b)(1)(A); *see Picard v. Connor*, 404 U.S. 270, 275 (1971); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997). To satisfy substantive exhaustion, which is not an exacting standard, a petitioner's claim before the state courts must have been federal or constitutional in nature. A petitioner must have "fairly presented" his claim to state courts by apprising them of "'both the factual and the legal premises of the claim [he] asserts in federal court.'" *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (quoting *Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*)). Procedurally, the petitioner must utilize all avenues of appellate review within the state court system before proceeding to federal court. *See Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994). He must raise a federal claim at each level of the state court system, "present[ing] the substance of his federal claims 'to the highest court of the pertinent state.'" *Id.* (quoting *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990)).

A petitioner is deemed to have exhausted state judicial remedies when the issue has been fairly presented in the state courts or the petitioner has otherwise given the state courts a fair opportunity to redress the federal claim. *Duncan v. Henry*, 513 U.S. 364, 366-67 (1995) (citing *Picard*, 404 U.S. at 270). Generally, the petitioner must have referred to the relevant federal constitutional provisions in the briefs submitted to state courts. *See Baldwin v. Reese*, 541 U.S. 27, 31 (2004) (finding inadequate exhaustion where the state court would have to look at the record beyond the petition or brief to be aware of the federal claim).

A claim may be presented for habeas review even if the federal grounds were not explicitly asserted before the state courts if the petitioner, in asserting his claim before the state court, can show "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *See Daye v. Attorney General,* 696 F.2d 186, 194 (1982).

### a. Improper Arrest Claims

Madera alleges that police officers arrested him despite an inconsistent eyewitness description, and following an "unduly suggestive police line-up." (Doc. No. 1 at 4.) In his Petition, Madera presents these improper arrest claims as "violations of due process." *Id.* In his Appellate Division brief and in his application for leave to appeal to the Court of Appeals, these claims are raised as components of his "weight of the evidence" claim. (Doc. No. 13-2 at SR1-49.). A weight of the evidence claim does not raise a federal constitutional issue, but construing Madera's *pro se* Petition liberally, the Court finds that he is asserting the same insufficiency of

the evidence claim, and therefore that he has successfully exhausted that claim. Madera has not, however, exhausted his suggestive lineup claim as a separate Due Process violation.

### (1)    Sufficiency of the Evidence

Madera exhausted his improper arrest claims by arguing in each of his appellate briefs that his conviction was against the weight of the evidence. (Doc. No. 13-2 at SR19-31.) Madera satisfies the substantive exhaustion standard because his claim before the state courts was federal and constitutional in nature. (*Id.*) He fairly presented his claim to the state court by referencing the Fourteenth Amendment of the Constitution, the New York State Constitution, and relevant New York State and United States Supreme Court cases. (*Id.*) Madera also procedurally exhausted his sufficiency of the evidence claim. He raised a federal claim at each level of the state court system, and presented the substance of this claim to the highest court of New York in constitutional terms. *People v. Madera*, 105 A.D.3d 680 (N.Y. App. Div. 1st Dep't 2013); *People v. Madera*, 21 N.Y.3d 1017, 994 N.E.2d 395 (2013). He utilized all avenues of appellate review within the New York State Unified Court System by appealing his conviction at every level of state court. *Id.* Madera was denied leave to appeal all three of his claims to the New York State Court of Appeals. (*Madera*, 994 N.E.2d 395.)

### (2)    Suggestive Lineup

Madera failed to raise his "unduly suggestive lineup" claim in his Appellate Division brief. (*Id.*) Because Madera directed the Court of Appeals to his Appellate Division brief for the claims he wished to raise on appeal, he also failed to raise an unduly suggestive lineup claim with the Court of Appeals. (Doc. No. 13-3 at SR189-96.) Madera cited no federal or constitutional law related to suggestive lineups. (*Id.*) Furthermore, he made no mention of the suppression hearing regarding the lineup and solely referenced trial testimony. As Respondent

argues, appellate review of a trial court's denial of a motion to suppress testimony is limited to the evidence presented at the suppression hearing. *People v. South*, 47 A.D.3d 734, 735 (2008)(collecting cases).

Federal habeas review is precluded where the petitioner fails to properly raise objections or to appeal to the state courts, unless the petitioner "can demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 711, 750 (1991); *see also Harris v. Reed*, 489 U.S. 255, 258 (1989). The Supreme Court has defined "cause" as a showing that "some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (citing *Murray v.Carrier*, 477 U.S. 478, 488 (1986)).[10] The "fundamental miscarriage of justice" exception "is only available where the petitioner can supplement his constitutional violation with 'a colorable showing of factual innocence'" in the form of newly adduced evidence of innocence. *Washington v. Superintendent, Otisville Correctional Facility*, 1997 WL 178616, at *7 (S.D.N.Y. April 11, 1997) (quoting *McCleskey*, 499 U.S. at 494); *see also Schlup v. Delo*, 513 U.S. 298, 332 (1995). Madera does not raise, and the record does not reflect, any facts to demonstrate cause and prejudice or a fundamental miscarriage of justice. Accordingly, Madera's unduly suggestive lineup claim is procedurally barred from habeas review.

### b. *Sandoval* Claim

Madera argues that the trial court's *Sandoval* ruling violated his Constitutional right to a fair trial. (Pet.) During the *Sandoval* hearing, the trial court ruled that the "jury has to know

---

[10] Examples include: "(1) outside interference that makes compliance with state procedural rules impracticable; (2) 'a showing that the factual or legal basis for a claim was not reasonably available to counsel'; and (3) '[i]neffective assistance of counsel.'" *Washington v. Superintendent, Otisville Correctional Facility*, 1997 WL 178616, at *5 (S.D.N.Y. April 11, 1997) (quoting *McCleskey*, 499 U.S. at 494 (citing *Murray*, 477 U.S. at 488)).

about" Madera's criminal history of one felony and eighteen misdemeanor convictions. (*Sandoval* Tr. at 11-12.) The judge held that the jury should be permitted to "inquire about the fact [that] he has a felony conviction in 2000 for possession of a criminal weapon in the third degree, the possession of the handgun" and said he would "ask [the jury] to limit themselves to the fact there are eighteen misdemeanor convictions and the dates of the convictions without going into the fact they're either trespass, theft of services, or mischief, but rather the dates of the eighteen misdemeanor convictions and the fact there are eighteen misdemeanor convictions." (*Sandoval* Tr. at 11-13.) The Petition states that "[t]he defense counsel argued for a reasonable compromise to avoid jury prejudice against the defendant as a 'person likely to commit a crime.'" (Pet. at 5.)

The right to testify on one's own behalf is a right founded in the Fifth, Sixth, and Fourteenth Amendments. *Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987). A court need not reach the merits of a *Sandoval* claim, however, if the petitioner did not testify at trial. *See Luce v. United States*, 469 U.S. 38, 41 (holding that "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify" because where he does not, the nature of his testimony is "unknowable," any harm from the ruling is "wholly speculative," the court "cannot assume that the adverse ruling motivated [the] defendant's decision not to testify," and the court has no way to conduct a harmless error analysis). Although *Luce* involved a direct appeal of a federal court's interpretation of a federal rule of evidence, courts have consistently applied its reasoning to a federal habeas court's review of state court rulings. *See Mercado v. Phillips*, No. 04-CIV- 2204 (GBD) (MHD), 2011 WL 1157617, at *6 (S.D.N.Y. Feb. 22, 2011) (collecting cases); *Butler v. Graham*, No. 07-CIV-6586 (JSR) (MHD), 2008 WL 2388740, at *8 (S.D.N.Y. June 12, 2008) ("[E]ven though there is no

unequivocal guidance on the application of *Luce* in habeas cases challenging a state-court conviction, we are of the opinion that the analysis in *Luce* should be deemed applicable to a habeas petitioner's challenge . . ."); *Peterson v. Lefevre*, 753 F. Supp. 518, 521 (S.D.N.Y. 1991), *aff'd*, 940 F.2d 649 (2d Cir. 1991).

The Court finds that the *Luce* rationale appropriately applies in this case and Madera's failure to testify at trial precludes his raising this issue on habeas review. Therefore, Madera's *Sandoval* claim is not cognizable on federal habeas review, and should be **DENIED**.

## B.   Merits of Madera's Claims

### 1.   Standard of Review

Under the AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13 (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable

application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002); *see also Yung v. Walker*, 341 F.3d 104, 111 (2d Cir. 2003) (amended order) (district court's habeas decision that relied on precedent from the court of appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). Importantly, "[a]n unreasonable application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410 (emphasis in original). The "distinction creates a substantially higher threshold for obtaining relief." *Renico v. Lett*, 596 U.S. 766 (2010) (citation omitted). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Because Madera appears *pro se*, the Court construes his petition liberally in order to raise the strongest arguments it presents. *See, e.g., Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006) ("We construe complaints filed by *pro se* litigants liberally and 'interpret them to raise the strongest arguments that they suggest.'") (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

## 2. Deference to State Court Factual Determinations

### a. Legal Framework

A petitioner faces a daunting task in making a sufficiency of evidence claim under AEDPA. "[A] determination of a factual issue made by a State court shall be presumed to be

correct." 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of "rebutting the presumption

of correctness by clear and convincing evidence." Id.; see also McKinney v. Artuz, 326 F.3d 87,

101 (2d Cir.2003) (citations omitted). This presumption of correctness is particularly important

when reviewing the trial court's assessment of witness credibility. See Cotto, 331 F.3d at *233–

34; see also Miller–El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 1040–41, 154 L.Ed.2d 931

(2003). It is the Court's duty to defer to state court findings of fact, "so long as 'fair minded

jurists could disagree' on the correctness of [the state court's] decision." *Harrington v. Richter*,

131 S.Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Although ADEPA affords a great amount of deference to credibility determinations by a state

court, the Supreme Court has made it clear that "deference does not imply abandonment or

abdication of judicial review." *Miller-El*, 537 U.S. at 340. The Court may grant relief to Madera

on the grounds of insufficient evidence where the state court decision was based on an

"unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d)(2). A decision which is "objectively unreasonable" in light of

the evidence presented may be overturned. *Miller-El*, 537 U.S. at 340. This includes findings

purported based on observations at trial:

> A federal court can disagree with a state court's credibility determination and, when
> guided by AEDPA, conclude the decision was unreasonable or that the factual
> premise was incorrect by clear and convincing evidence.

*Miller–El*, 123 S.Ct. at 1041. In sum, "[d]eference does not by definition preclude relief." *Id.* 336

F.3d at 161.

Petitioner and Respondent agree that the determination of reasonableness centers on the

testimony of one alleged eyewitness – Angela Krevey. Given that testimony, the case thus

presents one question: Is the testimony of Krevey sufficient to support a verdict of guilty beyond

a reasonable doubt? Mindful of the deference due state court determinations, and jury verdicts in particular, and considering the objective rationality of the evidence related to Krevey, the Court concludes that the answer is "**No.**"

> **b.** **Krevey did not qualify as an acquaintance witness.**

Krevey's testimony was problematic from the beginning because neither the court nor the parties seemes to agree whether this was an acquaintance or a stranger identification. While it is true that the case was ultimately argued as an acquaintance situation, some of the evidence emphasized suggested a classic stranger identification: emphasis on the lighting in the restaurant; how close the witnesses were to the robbers; the opportunities of the witnesses to observe the robbers during the robbery; a photographic show-up; and a lineup. At other times, the prosecution sought to emphasize Madera's alleged multiple encounters with Krevey. The prosecution has a significant dilemma: if this case is evaluated as a stranger identification, Krevey's descriptions of the perpetrators and the conduct of the lineup assume major roles in the sufficiency of the evidence claim.

The New York Court of Appeals long ago recognized that identification procedures can lead misidentification:

> In criminal investigations, the police employ a variety of identification procedures--including lineups, one-on-one showups, photo arrays, and (as in this case) single-photo displays. While such techniques help assure that the right person has been or will be arrested, if tainted by suggestion they can lead to irreparable misidentification. "The influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor--perhaps it is responsible for more such errors than all other factors combined. (Wall, Eye-Witness Identification in Criminal Cases, at 26; *see also, United States v Wade,* 388 US 218, 229.)

*People v. Rodriguez,* 79 N.Y.2d 445, 448-49. Seeking to avoid these miscarriages of justice, the legislature enacted CPL article 710. *Id.* at 449. This section requires the

prosecution to notify the defendant if it intends to offer identification evidence at trial so

that the defendant may make a motion to suppress the identification as unreliable. *Id.* The

court noted one narrow exception allowed by the rule: "In cases in which the defendant's

identity is not in issue, *or those in which the protagonists are known to one another,*

'suggestiveness' is not a concern and, hence, [CPL 710.30] does not come into play." *Id.*

(emphasis supplied).  The issue is the degree and quality of the prior contact:

> When a crime has been committed by *a family member, former friend or
> long-time acquaintance* of a witness there is little or no risk that comments
> by the police, however suggestive, will lead the witness to identify the
> wrong person. ... But in cases where the prior relationship is fleeting or
> distant it would be unrealistic to ignore the possibility that police
> suggestion may improperly influence the witness in making an
> identification.

*Id.* at 450 (emphasis supplied). There are some cases in which the witness is so familiar

with the suspect that identification is not a real issue and there are other cases in which

the taint of improper identification techniques makes it more likely that there will be a

false selection.  An exception to the notice requirement is appropriate when the individual

to be identified is well known to the witness:

> The exception may be confidently applied where the protagonists are
> family members, friends or acquaintances or have lived together for a
> time. At the other extreme, it clearly does not apply where the familiarity
> emanates from a brief encounter.

*Id.* (Internal citations omitted).  Of note, the witness in *Rodriguez* claimed to have seen the

defendant "[a]t least four dozen times," yet the court found that a *Wade* identity hearing was

required. The court held that "[t]o summarily deny a *Wade* hearing, the trial court had to

conclude that, as a matter of law, [the witness] knew defendant so well that no amount of police

suggestiveness could possibly taint the identification." *Id.* at 453 Given this standard, Krevey did

not qualify as an acquaintance witness, and the trialcourt appropriately held a *Wade* hearing in this case.

The prosecution nonetheless sought to build a record that Krevey knew Madera "so well" that any problems with the identification were insignificant. The problem is that the more the prosecution emphasized the alleged encounters with Madera prior to the robbery, the harder it is to find credible Krevey's failure to notice distinctive characteristics about Madera.

     **c.**    **Krevey's alleged encounters with Madera prior to the robbery do not credibly show that she was acquainted with him for identification purposes.**

Three individuals were victims of the January 21, 2010 robbery. Two of those individuals, Krevey and Chmiel, testified that they had interacted with Madera before the date of the robbery. Between January 2009 and January 2010, Krevey claimed to have seen Madera "quite frequently." (Tr. at 162, 201.) Since 2008, Chmiel said that he often noticed Madera in the area and had assumed he was homeless. (Tr. at 323.) Chmiel and Madera had had brief face-to-face conversations "maybe a half dozen times" as close as "five to ten feet" apart, and Madera sometimes came to the counter at the restaurant. (*Id.* at 307, 324.)

Krevey testified at length during the trial about multiple times she had seen Madera prior to the robbery. Out of numerous homeless individuals who lived in the vicinity of her office trailer, Krevey asserted that she saw Madera the most often – "a couple of times a week on bicycle or by foot" for at least one year before the incident. (Tr. at 162, 163, 176.) On at least one occasion, Krevey was only "two feet" away from Madera, (*Id.* at 202), and had a lengthy conversation with him about the café bathroom. (*Id.* at 163-64.) During this interaction she saw Madera's face clearly and recognized him as someone she had seen before. (*Id.* at 164.) Krevey

testified, in fact, that on the morning of the robbery she had seen Madera behind her car and waved him to the side. (*Id.* at 178.) When asked at trial if she had opportunities to observe Madera, Krevey repeatedly affirmed that she had observed his height, his clothes, his general build, his age, and his appearance. (*Id.* at 201-09.) She testified that she saw Madera so often that he "stood out" to her among the homeless individuals who frequented the area. (*Id.* at 162.) This testimony was not **credibleddd.**

### d. Krevey's description of the lookout was so far removed from Madera's actual appearance as to be not credible

Madera is a Latino male. He is approximately 6 feet, three inches tall. At the time of the robbery, he weighed about 170-175 pounds. He had a beard and a moustache, a small teardrop tattoo on his face, and long braids, which he wore sometime in a ponytail and sometimes down. He spoke with a noticeable Hispanic accent. Except for describing the perpetrator as tall[11] and slender, Krevey's portrait of the lookout bear no credible resemblance to Madera. Not only did her description seem vague to the investigating detective, but Krevey said the lookout was a

---

[11] The Court notes that "tall" is a relative term, and it could be unfair to raise questions based on that adjective. In this case, however, Krevey provided her own benchmark:

> Q. Okay. And let's -- Let's start with his height? How tall would you say this person was, as best you can?
> A. I think 5' 11, 6 ' ; 5 ' 11, 6 feet , 5 '11.
> Q. Okay. And how tall are you, I 'm sorry?
> A. I'm sorry, I would say - - I'm thinking of my father - - 5 ' 10 , 5 ' 11, I would say, and I 'm 5 ' 6 .
> Q. And you said - - you just mentioned, did you just say something -- you related it to someone you know?
> A. I am just trying to think of how tall certain people are to give you a fair answer to that question.
> Q. And was there anyone in particular that you were thinking of when you· gave what ·the answer was?.
> A.I was trying to think about how tall six feet was. I just mentioned -- I just thought of my father?
> Q. How tall is your father?
> A .6 ' 1.
> Q. And, this person was a little shorter than your father?
> A.Maybe a little bit.

(Tr. 203-04.)

light-skinned black male. *Id.* at 367. She described no facial hair (Id. at 374) and noted nothing distinctive about his hairstyle. *Id.* at 376. At trial, Krevey testified that the lookout was a dark-skinned Hispanic male with long braids. He was wearing a gray hooded sweatshirt.

### e. The State Court's factual determinations were unreasonable

A federal court may disagree with a state court's credibility determination, and conclude the decision was unreasonable, or that the factual premise was incorrect by clear and convincing evidence, so long as the court is guided by the standards set forth by ADEPA. *Miller-El*, 123 S.Ct. at 104. However, the extent to which ADEPA standards have been met in determining whether a factual determination was "unreasonable" is a question that remains to be answered. The Supreme Court granted certiorari in *Wood v. Allen* to review the question of whether a petition must establish that the state-court factual determination was "unreasonable" under 28 U.S.C. § 2254(d)(2), or whether the petitioner must additionally rebut a presumption that the determination was correct with clear and convincing evidence under 28 U.S.C. §2254(e)(1). *Wood v. Allen*, 558 U.S. 290, 299 (2010). However, the Court did not determine whether the "arguably more deferential standard" of § 2254(e)(1) should apply. *Id.* at 301. The relationship between the two provisions remains uncertain. *See Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) ("we have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here"). In providing guidance as to whether a determination is "unreasonable", the Supreme Court has reiterated that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood*, 558 U.S. 290 at 301 (citing *Williams v. Taylor*, 529 U.S. 362, 310 (2000)). If this were the standard, it would have been met here. In seeking to frame the issue more broadly, however, the Court has examined the reasonableness of the determination from different perspectives.

For this case, the reasonableness of the state court determinations boils down to one question: Was it reasonable to credit Krevey's identification of Madera as the lookout? To begin to answer this ultimate question, the Court has endeavored to pose a series of intermediate questions in the form "Was it reasonable to believe . . .?

The Court's analysis actually begins with two topics which were largely ignored by the focus on the lineup: Clothing worn by the robbers and voice identification. It is axiomatic that evidence consists not only of facts that are shown but also by the absence of facts that are expected.

### Was it reasonable to believe that at the time of the robbery that Madera was dressed as the victims agree the robbers were dressed?

All the evidence was consistent with the fact that Madera was homeless. Krevey testified that Madera tended to wear "[s]habby, unwashed" clothing. (*Id.* at 205-08). Chmiel, who encountered Madera only minutes before the robbery testified that he was wearing "decrepit" kind of clothing. (Tr. at 269.) This was also consistent with Madera's appearance when arrested - multiple layers of clothing, bright top. (*Id.* at 349.) On the other hand, Krevey described the robbers as two light-skinned male blacks wearing "gray hooded sweatshirts."(*Id.* at 210.) Chmiel identified Madera as rummaging through garbage and dressed in decrepit clothing when he arrived at the restaurant ahead of Krevey. Krevey testified that the robbery occurred "five to ten minutes" after she arrived. If Madera was the lookout as Krevey claims, he either should have been wearing the same clothes when he participated in the robbery or he had to have changed clothes in the short interval between encountering Krevey and the actual robbery. Neither scenario seems reasonable. If he was wearing the same clothes, is it reasonable to

believe that not one of the victims noticed?[12]  If Madera was the lookout, and he wasn't wearing the same clothes, then he must have changed in the minutes before the robbery. Krevey testified that when she walked past Madera, they made "eye contact." Tr. at 179. Is it reasonable to believe that he participated in a robbery five or ten minutes later and didn't cover his face?  Does it make sense that a would-be robber plans a change of clothes but fails to cover his face?  And where could this change have taken place?

### *Was it reasonable to believe that no one indicated that the lookout had a Hispanic accent?*

The prosecution spent considerable time trying to explain the discrepancies in Krevey's [physical description of Madera but completely avoided the fact that his voice would have given him away. Chmiel and Mahoney's trial testimony do not corroborate Krevey's identification of Madera as the lookout.  Although Chmiel and Mahoney testified that they did not have an opportunity to see the lookout's face, the witnesses were able to hear the lookout's voice when he yelled for his accomplice to leave. (Tr. at 275, 315.)[13]  During trial, Chmiel testified that he assumed Madera was "Hispanic," because of his "Hispanic accent." (*Id.* at 306.)  Indeed, Madera is a Latino male. (Doc. No. 14-6 at 397-98) However, no witness reported to the police or testified at trial that the lookout had an accent.[14]

### *Was it reasonable to believe that Madera participated in a robbery with his face uncovered and just kept hanging around the restaurant?*

---

[12] Descriptions about how perpetrators are dressed are in many respects more important than some of the other information provided by witnesses.  It is not unusual for suspects to be first noticed by the clothing they are wearing. Indeed, it is hard to imagine that an investigating officer would not ask how a perpetrator was dressed.

[13] Chmiel:

> Q. What happened after that?
> A. The man in the other half of the trailer started yelling to get out, let's get out of here.

[14] Cf. Federal Rule of Evidence 901(b)(5): Authenticating or Identifying Evidence

> Opinion About a Voice. An opinion identifying a person's voice — whether heard firsthand or through mechanical or electronic transmission or recording — based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

Madera's own behavior in the days following the robbery does not corroborate the allegations against him. Madera was arrested for an open container violation outside of the café a few days after the robbery occurred. (Tr. at 139-41.) When he was arrested, Madera gave his belongings to one of Krevey's co-workers. (*Id.* at 394, 397.) That property included "two cell phones," neither of which belonged to any of the victims of this case, and "no money." (*Id.*) Krevey's husband later gave Madera's property to the police. (*Id.* at 235.) It is unlikely that a participant in an armed robbery would subsequently spend time in the area the robbery occurred. It is especially unlikely where, as here, the victims had had numerous face-to-face interactions with the perpetrator and would recognize him. It is also unlikely that a participant in an armed robbery would turn over his belongings to a coworker of the people he robbed. It is especially unlikely that this person would not have the fruits of his crime on his person when arrested if he was homeless, as Madera was.

### *Was it reasonable that Krevey didn't mention that the lookout was a homeless man who frequented the area?*

At trial, counsel brought up Krevey's failure to give this fact during the 911 call. But forget about the 911 call. Maybe Krevey had other things on her mind. Maybe she just wanted to get the police there as quickly as possible. Sure, there are people who would have blurted out something akin to, "We just got robbed by this homeless guy from the area." Let's give Krevey the benefit of the doubt that she is not that kind of victim. Let's even put aside the police reports for now. Although Detective Galan seemed thorough and Krevey charitably can be described as uncertain, Krevey denied or didn't remember some of the information testified to by Detective Galan. Give Krevey a pass on all this, and there is still one nagging question remaining: Is it reasonable to believe that Krevey would not have mentioned this important fact to her co-workers? The prosecution went to great lengths to convey the idea that Madera was a known

individual around the restaurant. Krevey testified that he was frequently around. Chmiel testified that he was frequently around. Krevey even testified about the notorious encounter where Madera allegedly wanted to use the bathroom. And yet, there is no testimony from anyone, nothing in the record even suggesting that there were conversations between the victims about this lookout who frequented the area of the restaurant. This is not just unreasonable, it'is incredible. It is not difficult to predict how the robbery investigation would have taken a more focused approach. Each of the victims would have been asked about this frequent homeless visitor. Each would have been asked to share all they knew about the suspect, his appearance, his habits.

### f.    The Prosecution's theory of the case is not reasonable.

According to the prosecution, Fernando Madera, a well-known homeless man, who frequented the area of the Pier i Café, conspired with an unknown person to rob the restaurant. No one testified about ever seeing Madera with a second person, and the prosecution does not suggest whethet Madera hatched this plot and brought in another man or that the other person conceived the robbery and enlisted a homeless man (Madera) to act as a lookout. The prosecution does, however, posit that Madera arranged a confrontation with Krevey so that he could discover who had management authority within the restaurant.[15] On the day of the robbery, Madera, knowing that Krevey was the person with authority, waited until she arrived before executing the robbery. Before Krevey arrived, however, Madera went about rummaging through

---

[15] The prosecutor argued in the Closing that Madera was not "just the lookout," but had used the argument with Krevey as a ruse to learn the layout of the trailer:

> MS. CARTY:  There is no reason to assume that Angela Krevey would be the one to know how to open that safe unless you previously dealt with her. The defendant had that experience. In this case the defendant isn 't just the lookout. Like I said, he had entered the trailer about two months before and it had nothing to do with not being able to use the bathroom. He had the argument with her, he knew who she was, he knew what the trailer looked like.

Tr. 460.

garbage cans where he was seen by Chmiel. At the time Chmiel saw him, Madera was wearing decrepit clothing. During the robbery, the gunman entered the second half of the trailer, put a gun to Krevey's head, and threatened her life, but she got a view of the lookout when his bandanna did not completely cover his face. Although she recognized Madera as as someone who frequented the area, Krevey did not mention this to the 911 operator, did not tell the main investigating detective, and did not tell any of her co-workers. Although Krevey claimed to be familiar with Madera, her description of him was vague, and she failed to convey to the investigating officer distinctive physical characteristis of Madera. Despite the robbery, Madera returned to the vicinity of the restaurant where he was arrested.

### g. Respondent improperly seeks to reference a document not admitted into evidence.

During the trial, the prosecution sought to introduce a document purporting to be a written account of an interview of Krevey by Detective Brennan. This document alleges that Krevey <u>did</u> indicated that the lookout was a homeless man who hung out near the restaurant and was seen by Krevey just before the robbery. In his opposition to this Petition, Respondent asserts that this document undermines Madera's claim of actual innocence.

> Regardless of whether detective Brennan's report was admitted into evidence, the report effectively refutes any claim that petitioner is actually innocent.

Memorandum of Law in Opposition to the Petition for a Writ of Habeas Corpus (Doc 13-1), at 27 n. 12 This argument is meritless, both legally and factually. First, the argument has a faulty legal premise for it injects into the Court's consideration the claim of actual innocence even though the Petition centers around the frailty of the admitted evidence and its ability to support a conviction beyond a reasonable doubt. This alleged claim of innocence is taken from one line in Madera's brief before the Appellate Division in a section in which he is arguing principally that

the verdict was against the weight of the evidence:

> The facts suggest that Ms. Krevey, frightened after a gunpoint robbery in which she could not see the perpetrators well enough to make a useful description, substituted a blank face for that of an innocent man who happened to be tall and thin, whom she argued with in the past, and whom she heard had been arrested.

State Record ("SR") at 31 (Doc. No. 13-2). Seizing upon this sentence, and relying on *House v. Bell*, 547 U.S. 518, 538 (2007), Respondent takes the opportunity to put before the Court a document not considered by the jury. While the Court in *Bell* held that even evidence not admitted may be considered in evaluating a claim of actual innocence, the Court also made clear that "the gateway actual-innocence standard is 'by no means equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).' which governs claims of insufficient evidence." (*Id.*)

> In *Bell*, it was appropriate to consider
>
> all the evidence, old and new, incriminating and exculpat0ry, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.' Based on this total record, the court must make 'a probabilistic determination about what reasonable, and properly instructed jurors would do.' The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

(Internal citations omitted) (*Id.* at 538.) This standard was appropriate in *Bell* because the petitioner was making a claim of actual innocence based on new evidence. While it is true that Madera steadfastly maintains his innocence, the claim in the instant Petition centers on the insufficiency of the evidence presented against him.

Respondent's argument is also flawed because it assumes that the alleged evidence is indisputable. Respondent's assertion that a document of questionable provenance would have served to bolster the prosecution's case ignores the real possibility that the document might

actually raise additional doubts. Unless one accepts the proposition that because the document allegedly had its genesis with police officers it must be authentic, Madera had a right to confront the purported author. He had a right to ask if there was a suspect identified why was that fact not conveyed[16] to Detective Galan? Why did Galan have to contend with "vague" descriptions of someone that Krevey allegedly knew so well? Why were the other victims not questioned about this identification? It is not a foregone conclusion that even if the document had been admitted in Brennan's absence that it would have made the prosecution's case stronger. If admitted without explanation, it would have stood in stark contrast to the actions during the investigation that it likely would have raised more question rather than supply answers. The Court notes, for example, that Brennan was a proposed witness for the defense - under subpoena (Tr. at 10) - and not the prosecution, a fact which even surprised the trial court:      \

> THE COURT: Okay. Now I understand the only potential witness the People may have left would be detective Brenner [sic]; is that correct?
> MS. CARTY: It's detective Brennen [sic] and, no, that witness will be the defense's witness, not the People's witness.

Tr. 409.

### h.    The prosecution made suggestions to the jury which were not based on valid social science theory.[17]

The prosecution recognized that its case rested almost exclusively on the testimony of Ms. Krevey. It was also aware that Krevey's testimony was inconsistent[18] and, at times contradictory, especially when compared to that of the investigating officer, Detective Galan.

---

[16] Respondent would have the Court believe that Brennan and Galan would have only communicated through the document in question, that Brennan would not otherwise have informed Galan that the lookout was an individual who frequented the area..

[17] The Court recognizes that Madera does not challenge the prosecution's Closing. However, because this is a claim of sufficiency of the evidence, it is important to understand the factors which might lead a jury to make unreasonable findings. As noted below, the prosecutor sought to undermine the police officers. This had the probable effect of leaving the jury with no authority figure to rely on -- except the prosecutor.

[18] Even the prosecutor had to acknowledge to the jury that Krevey's testimony had problems: "[I]f Ms . Krevey was going to come into court and lie, she would have done a better job. . ." (Tr. at 455)

First, the prosecutor asked the jury to disregard much of the damaging testimony by Detective Galan by painting him as a careless, sloppy, and unprofessional person:

> And we also know when he was on the stand in a serious case he didn't have all his paperwork. He wasn't organized. He wasn't pulled together. He didn't even make sure during that lineup the heights of the people were hidden when they came to the window. It just didn't seem to occur to him because he's not a careful person and he doesn't take the time to do something the right way.
>
> You know, he's not careful.
>
> You heard Angela Krevey say the defendant had long braided hair about shoulder length, some of it was sticking out. She thinks the detective didn't write that down. And, obviously, we don't know why.

(Tr. at 452.)

Next the prosecutor stated a number of propositions which were facile but simply not true. The following examples demonstrate the problem.

Proposition 1:

> Now, Ms. Krevey did not give a detail of the defendant to the police. She didn't give a detailed description on the witness stand and no one could or should be arguing she did give a detailed description of him. That doesn't mean she doesn't know who he is. The description of a tall, slender, light-skin African American with big ears. To some people might mean a description of Will Smith. To others that might be a description of President Obama. (Tr. 449-50.)

While this has a certain superficial appeal, and invokes some well-known personages, it is a fallacy. Unless you're playing some kind of game, if you <u>know</u> it is President Obama, you wouldn't tell the person listening that it was some unnamed light-skinned African American.

Proposition 2:

> You look at something that person imprinted on your brain. And every one of us does it every day. It starts when we're babies and we recognize our parents and we -- as we get older we start to recognize more and more people, our coworkers, our

> friends, our relatives, the guy at the dry cleaner store, the coffee cart guy who
> hands you your coffee exactly the way you like it and has it ready before you get
> to the cart because you recognize him and he recognizes you. It's part of the
> human condition. (Tr. 456-57.)

Although this makes an interesting narrative, it is a fallacy, and should be obvious to most

people. Memory is not like a camera. It is malleable and subject to being affected by multiple

factors. Certainly, some people have excellent memories, and some have excellent memories for

faces, but it is not part of the human condition. For every parking lot attendant who has your car

ready before you hand in your receipt there is someone who seems to need introduction every

time they meet the same person.

Proposition 3:

> Because in every person's life, there are certain images that stay in your mind, a
> shocking event, a startling event. And some events are so shocking and startling
> that those images stay in your mind, the important parts. (Tr. at 457.)

This notion that the big, shocking events indelibly mark themslves in our memory is inconsistent

with the social science of identification. As the Second Circuit recognized in *Young v. Conway*,

698 F.3d 69, 81(2d Cir. 2012), "high levels of stress have been shown to induce a defensive

mental state that can result in a diminished ability accurately to process and recall events, leading

to inaccurate identifications," and that accuracy decreased 22% under high stress situations. *Id.*

Indeed, while the prosecution suggested that Ms. Krevey would have to be evil to make a false

accusation, the reality is that this case had multiple factors which the court in *Young v. Conway*

identified as affecting identifications:

> In assessing this first Wade factor, we find illuminating the social science
> research, presented by the Innocence Project, addressing the effect of disguises,
> weapons, stress, and cross-racial identifications on those identifications' accuracy.

*Id.* at 80. With respect to the fourth factor, the court observed

[S]ocial science research indicates that people are significantly more prone to identification errors when trying to identify someone of a different race, a phenomenon known as "own-race bias." "There is a considerable consistency across [scientific] studies, indicating that memory for own-race faces is superior to memory for other-race faces. Studies have thus found a "tendency for people to exhibit better memory for faces of [members of their own race] than for faces of [members of another race]."

*Id.* at 81. (internal citations omitted)  Ms. Krevey had considerable difficulty in this area, embodied in her assertion "dark-skinned Hispanic, light-skinned black, I don't…I don't know if that's the same thing…" (*Id.* at 213.)

In the charge to the jury, the trial court succinctly put it:

In this case, as you are aware, the only evidence which establishes or tends to establish that the defendant is the actual perpetrator, the right man, is the testimony of the eye witness, Angela Krevey. Apart from her testimony that the defendant is the right man, there is no other evidence which identifies the defendant as the perpetrator. In such case the law requires that the jury be satisfied that the identification -- testimony by Angela Krevey is as certain as human recollection permits to the most favorable circumstances.

(Tr. at 473.)

While Madera cannot bring a claim directly based on the lineup or the prosecutor's statements, each is important in understanding how the flawed identification and prosecutorial statements in this case could result in a conviction when reason counseled a different result. This is not an assertion about lying but about coming to believe something that is not true.

In this case, Petitioner has met his burden in establishing clear and convincing evidence contrary to Krevey's identification of Madera as the lookout.  Specifically, the state court's decision to convict Madera despite Krevey's vast contradictions, when she was the only witness to identify him as the lookout, is a violation of Madera's due process rights, and is contrary to established Supreme Court precedent. *See Williams*, 529 U.S. at 410.  Concerned with the problems of eyewitness identification, the Supreme Court in *Manson v. Brathwaite* highlighted

several interests that must be taken into account. 432 U.S. 98, 111-12 (1977) (citing *United States v. Wade*, 388 U.S. 218 (1967); *Gilbert v. California*, 388 U.S. 264 (1967); and *Stovall v. Denno*, 388 U.S. 293 (1967)). The Court focused on the reliability of the witness's identification, and noted that the witness's recollection may be distorted easily by the circumstances or by later actions of the police. *Id.* "*Wade* and its companion cases reflect the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability." *Id.*

The Court concluded that "reliability is the linchpin" in determining identification testimony, and identified the factors set forth in *Neil v. Biggers* to be considered in determining whether an identification was reliable. *Id.* at 114 (citing *Neil v. Biggers*, 409 U.S. at 199-200). The factors include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199-200. In considering the question of reliability, the Court assessed these factors in light of the totality of the circumstances. *Id.*

Under the totality approach, this Court finds that Krevey's identification, the sole identification connecting Madera directly to the robbery, is unreliable. Taking each factor in turn, Krevey had an opportunity to view the lookout at the time of the crime. In fact, she was the only witness out of the other two individuals, Mahoney and Chmiel, who saw the lookout's face clear enough to identify him as Madera. Krevey's degree of attention and the accuracy of her prior descriptions of the lookout are questionable at best. Inconsistencies are evidenced in Krevey's description of the lookout's clothing, race, facial hair, and hairstyle. The Court finds

her testimony in which she admits that she does not know the difference between a dark-skinned Hispanic and a light-skinned black particularly disturbing. (Tr. at 213). Yet, Krevey shows a high degree of attention to the number of times she has seen Madera as a homeless man frequenting the area around the trailer. Still, there is no evidence that she identified the lookout as someone she recognized with that frequency until Detective Brennan's report, which was not admitted into evidence. Furthermore, at trial, Krevey did not identify Madera as the lookout with any level of certainty when asked the first time if she recognized the lookout in the courtroom. She stated that she did not know, because she was nervous, and because her "view" was "blocked". (*Id.* at 254-55.) It was not until Krevey was asked again on redirect if she recognized the lookout that she was able to identify Madera.

Finally, the Court takes issue with the length of time between the crime and two of Krevey's confrontations with Madera. First, the Court finds it troubling that Krevey identified Madera during a lineup only a day after learning that a homeless individual had been arrested, and after she contacted Detective Galan, who conducted Madera's lineup. Second, the state court proceedings took place one year and two months following the robbery and Krevey's pretrial identification. Krevey testified that she saw Madera "at least once or twice a week," from January 2009 to January 2010. Yet, she was unable to identify him in court as the lookout and homeless individual she identified to Detective Galan, despite her familiarity with Madera, her prior identification, and the fact that the in-court identification took place only a year later.

The Court disagrees with the state court's credibility determination of the only witness connecting Madera and the accomplice in the Pier i Café robbery. Therefore, under the standards set forth by ADEPA, there is clear and convincing evidence contrary to the factual determination made by the state court, and the state court's decision to convict Madera on the

basis of the unreliable evidence presented is unreasonable.

## IV. CONCLUSION

For the reasons stated above, I recommend that Madera's petition for a writ of habeas corpus be **GRANTED**. Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Analisa Torres, 500 Pearl Street, Room 2210, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health & Human Servs*. 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. SEC 636(b)(1) (West Supp. 1995); Fed. R. Civ P. 72, 6(a), 6(d).

**DATED: November 15, 2017**
**New York, New York**

**Respectfully Submitted,**

*[signature]*

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

This Report and Recommendation was filed on ECF and a copy was mailed to:

*Pro se* Petitioner
Fernando Madera
11-A-2435
Livingston Correctional Facility
P.O. Box 91
Sonyea, N.Y. 14556